IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

SHIRLEY A. COLE                                                          PLAINTIFF

VS.                                    CIVIL NO. 06-2025

JO ANNE B. BARNHART,
COMMISSIONER, SOCIAL SECURITY ADMINISTRATION                            DEFENDANT

## MEMORANDUM OPINION

Shirley Cole ("plaintiff"), brings this action pursuant to § 205(g) of the Social Security Act

("the Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of

the Social Security Administration denying her application for disability insurance benefits ("DIB")

under Title II of the Act.

## Background:

The application for DIB now before this court was filed on April 25, 2003, alleging an onset

date of October 15, 1997, due to migraine headaches, carpal tunnel syndrome in both wrists, weak

wrists, pain in the arms and back, and an inability to write "very well."  (Tr. 16, 57-65).  An

administrative hearing was held on September 23, 2004.  (Tr. 284-308).  Plaintiff was present and

represented by counsel.

The ALJ issued a written decision on June 30, 2005, finding that plaintiff was not disabled

within the meaning of the Act between October 15, 1997, plaintiff's alleged onset date, and July 31,

2002, plaintiff's date last insured.[1]  (Tr. 12-23).  He concluded that, while plaintiff's migraine

---

[1]DIB operates as a type of insurance policy against disability.  Much like an insurance
policy, the DIB participant will lose their eligibility for benefits within a certain period of
time after they stop paying into the Social Security system.  *See* 20 C.F.R. § 404.101.  As
such, DIB applicants must establish their eligibility for benefits prior to the expiration of their
insured status.  *See Pyland v. Apfel,* 149 F.3d 873, 876 (8th Cir. 1998).

headaches and bilateral carpal tunnel syndrome were "severe" within the meaning of the Regulations, they did not meet or medically equal an impairment contained in the Listing of Impairments in Appendix 1 to Subpart P of Regulations No. 4. (Tr. 22). The ALJ then determined that plaintiff retained the residual functional capacity ("RFC") to perform medium level work requiring only occasional stooping and crouching. He also found that plaintiff could not climb stairs, ropes, or scaffolds or perform activities requiring frequent, rapid, or repetitive wrist movement. The ALJ noted that plaintiff also had mental limitations resulting in a limited but satisfactory ability to remember work-like procedures; understand, remember, and carry out simple and detailed instructions; maintain attention and concentration; maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without supervision; make simple work-related decisions; perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to routine changes in a routine work setting; set goals and make plans independently of others; deal with stresses of semi-skilled work; interact appropriately with the general public; and, maintain socially appropriate behavior. However, he determined that plaintiff was seriously limited in her ability to work in coordination or proximity to others without being unduly distracted by them; complete a normal workday and work week without interruptions from psychologically based symptoms; and, deal with normal work stresses. With the assistance of a vocational expert ("VE"), the ALJ then concluded that plaintiff could perform the positions of newspaper carrier, motel cleaner, and dump truck driver. Based on the VE's testimony,

2

he found that there were a significant number of jobs in the national economy that plaintiff could still perform (Tr. 23).

At the time of the ALJ's decision, on June 30, 2005, plaintiff was sixty-one years old and possessed a fifth grade education and no vocationally relevant past work experience.  (Tr. 16).

On December 21, 2005, the Appeals Council declined to review this decision. (Tr. 4-7). Subsequently, plaintiff filed this action.  (Doc. # 1).  This case is before the undersigned by consent of the parties.  Both parties have filed appeal briefs, and the case is now ready for decision.  (Doc. # 7, 8).

**Applicable Law:**

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002).  Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.  The ALJ's decision must be affirmed if the record contains substantial evidence to support it.  *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently.  *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

3

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382(3)(c). A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. *See* 20 C.F.R. §§ 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520, 416.920 (2003).

4

**Evidence Presented:**

The relevant medical evidence is as follows. On June 7, 1989, plaintiff underwent carpal tunnel syndrome release surgery on her right wrist. (Tr. 185-186). On July 12, 1989, this same procedure was performed on plaintiff's left wrist. (Tr. 188).

Between September 1, 1996, and August 6, 1999,[2] plaintiff was repeatedly seen in the emergency room for migraine headaches. (Tr. 135-147). Records indicate that plaintiff was not taking any preventative medications. Each time she was treated, plaintiff was given Phenergan and either Nubain, Vistaril, Stadol, or Darvocet. Records indicate that the treatment was successful and that plaintiff was released home in stable condition.

On October 19, 1997, Dr. Lee Tackett diagnosed plaintiff with sinusitis and cepahlgia (headaches). (Tr. 202). For this, he prescribed Toradol and Compazine injections, Dynabac, and Claritin. (Tr. 202).

On November 13, 1997, plaintiff complained of a severe headache with nausea and vomiting. (Tr. 201). She also reported lower back pain with pain radiating into her legs. Dr. Lee Tackett diagnosed her with migraine headaches and prescribed Compazine. (Tr. 201).

On November 6, 2001, plaintiff was treated for a burn to her left wrist. (Tr. 134). She had reportedly burned it one week prior to seeking treatment. At the time of her appointment, plaintiff complained of increasing pain. Dr. Kradel noted a small area of skin breakdown on the palmar

---

[2]Specifically, plaintiff was treated on September 1, 1996; July 8, 1997, September 4, 1997; April 15, 1998; June 19, 1998; August 21, 1998; September 23, 1998; September 26, 1998; November 5, 1998; January 16, 1999; February 21, 1999; March 5, 1999; and, August 6, 1999. (Tr. 135-147).

aspect of the left wrist.  He also noted a white area on her hand which was apparently a secondary burn that was healing well.  Dr. Kradel assessed the area as second degree with a possible small area of third degree burn on the left wrist.  Because the wound was healing well, he believed that plaintiff's discomfort was due to regeneration of the nerves in the affected area.  Accordingly, Dr. Kradel prescribed Silvadene cream and Tylox.  He also directed her to change her dressings twice per day and to clean the burned area with Peroxide.  (Tr. 134).

On February 26, 2002, plaintiff sought treatment for complaints of a cough; congestion; runny nose; sore throat; body aches; and, back, chest, epigastric, and suprapubic pain.  (Tr. 132). She reported that the pain was exacerbated by movement and reaching and that her cough was made worse by lying down.  Dr. Kradel examined plaintiff and noted some muscular tenderness in her thoracic spine and mild, diffuse tenderness in her abdomen.  Laboratory testing was unremarkable, so Dr. Kradel diagnosed plaintiff with sinusitis versus a viral syndrome.  Because her symptoms had been persistent, he prescribed Keflex and Prolex DH.  (Tr. 132).

On October 15, 2002, plaintiff was treated for nausea, vomiting, diarrhea, a low grade temperature, and body aches.  (Tr. 130).  Dr. Kradel prescribed Phenergan for the nausea and vomiting and Vicodin to control the diarrhea and muscle aches.  He also advised plaintiff to drink plenty of fluids.  (Tr. 130).

On October 23, 2002, plaintiff was treated for gastroenteritis.  (Tr. 128).  She was directed to remain on clear liquids for at least twenty-four hours.  (Tr. 128).

Plaintiff underwent a general physical examination on July 23, 2003.  (Tr. 148-154).  She complained of chest pain and shortness of breath; abdominal pain with gas made worse by eating and

6

drinking; pain in her wrists, hands, knees, hips and back; and, migraine headaches. (Tr. 150). A physical examination revealed normal flexion, extension, and rotation of the spine and a normal range of motion in all areas. Plaintiff's neurological examination was also normal. (Tr. 151-152). However, plaintiff was unable to walk on her heel and toes. (Tr. 152). An x-ray of her lumbar spine revealed mild changes of osteophytosis[3] and mild decreased disc space. (Tr. 153). An x-ray of her right hand revealed an intact bony structure, but the bones seemed osteoporotic.[4] (Tr. 153). Dr. Michael Westbrook diagnosed plaintiff with back pain, degenerative disc disease/degenerative joint disease, migraine headaches, post carpal tunnel syndrome, and chest pain worse when eating or drinking. (Tr. 154, 154A). From a mental standpoint, he noted that plaintiff was flat with a depressed mood. (Tr. 153). However, he found no evidence of psychosis. (Tr. 153).

Plaintiff participated in counseling and treatment at Counseling Associates from June 2, 2004, through August 23, 2004. (Tr. 234-250). Her complaints at her initial visit of June 2, 2004, included depression; crying spells; migraine headaches; pain in her back, chest, and arms; insomnia; nightmares; and, appetite problems. (Tr. 246, 247). Plaintiff also reported a history of sinus problems, chronic migraines, emphysema, and fainting spells. (Tr. 248). She indicated that she had made threats to hurt herself and sometimes thought her family would be better off without her. Plaintiff stated that she liked "nothing" about herself. (Tr. 249). As such, plaintiff was diagnosed

---

[3]Osteophytosis is a condition characterized by the formation of multiple outgrowths or excrescence of a bone. *See Osteophytosis*, *at* www.medcyclopaedia.com; *Osteophyte*, *at* www.medcyclopaedia.com.

[4]Osteoporotic means having the characteristics of osteoporosis. *See* Theresa Defino, *No More Broken Bones: Medication Reduces Fractures in Osteoporotic Women*, *at* www.webmd.com.

AO72A
(Rev. 8/82)

with depressive disorder not otherwise specified, psychotic disorder not otherwise specified, migraine headaches, chronic back pain, and carpal tunnel syndrome.  (Tr. 244).  Her major treatment areas were listed as depression/anxiety and delusional thoughts.  (Tr. 245).  Progress reports show that she was often tearful, depressed, and did not want people bothering her.  (Tr. 237, 241).

Plaintiff's treating physician, Dr. Ben Jacobs, wrote a letter dated June 7, 2004, in which he opined that plaintiff's present complaints of cervical spine pain with radiation to the right arm and migraines made her a good candidate for disability.   (Tr. 198).  Dr. Jacobs further stated that her current problems had led to depression for which she was presently on antidepressants.  (Tr. 198).

On June 14, 2004 she was assessed with hypertension, migraine headaches related to upper cervical disc disease, anxiety and depression, and gastroenteritis with vomiting and diarrhea.  (Tr. 256).  For this, she was prescribed Inderal and Zoloft.  (Tr. 256).

Plaintiff saw an orthopaedist, Dr. Russell B. Allison, on August 20, 2004.  (Tr. 251-253). He found that she was able to walk in a normal heal to toe fashion, had no atrophy to her legs, and was able to get on and off of the exam table without much difficulty.  (Tr . 253).  "A little" edema was noted in her lower legs but it was fairly diffuse and equal on both sides.  Dr. Allison noted that plaintiff was constantly rubbing her right upper arm but she had a good pulse in that location.  X-rays of her back were considered normal and revealed osteopenia.  (Tr. 253).  Dr. Allison sent her for a magnetic resonance image (MRI) of her back at her request.  (Tr. 253).  The MRI of her lumbar spine revealed bulging discs at L3-4 and L4-5 levels with a spinal canal diameter within the borderline to lower limits of normal at the L2-3, L3-4, and L4-5 levels.  (Tr. 220).

8

On August 23, 2004, Dr. Donald H. Pennington completed a mental impairment questionnaire regarding plaintiff. (Tr. 212-219). He diagnosed her with recurrent and severe major depressive disorder and chronic pain, back problems, migraines, and carpal tunnel syndrome. (Tr. 212). He noted that she had experienced a limited response to previously prescribed antidepressants. Clinical findings revealed suicidal ideation, limited insight into problems, delusional thought process, poor attention span, and a limited education. (Tr. 213). The doctor found that plaintiff had a "fair" prognosis. Her signs and symptoms were listed as anhedonia or pervasive loss of interest in almost all activities, thoughts of suicide, feelings of guilt or worthlessness, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, hallucinations or delusions, illogical thinking, a short term memory impairment, and sleep disturbance. (Tr. 213, 214). Dr. Pennington concluded that plaintiff was seriously limited but not precluded from working in coordination with or proximity to others without being unduly distracted; completing a normal workday and workweek without interruptions from psychologically based symptoms, and dealing with normal work stresses. (Tr. 215, 216, 217). Plaintiff's mental abilities were limited but satisfactory in all other areas.

Dr. Pennington determined that plaintiff's depression lowered her pain threshold and tolerance level. (Tr. 217). As such, he noted moderate functional limitations with regard to activities of daily living and concentration, persistence or pace. Dr. Pennington found that plaintiff suffered from marked limitations in the area of maintaining social functioning. (Tr. 217). Although no areas of decompensation were noted, Dr. Pennington opined that plaintiff's impairments would last at least twelve months. (Tr. 218, 219).

9

Plaintiff returned to Dr. Allison's office on August 27, 2004. (Tr. 252). He noted that she was crying, but was able to ambulate smoothly, had no muscle atrophy, and used no assisting devices. Dr. Allison could not detect any significant abnormalities, aside from discomfort. (Tr. 252). He told plaintiff that he did not have a cure or diagnosis for her. Dr. Allison stated that one surgical procedure would not cure all of her aches and pains. As such, he recommended that she see a pain management specialist. (Tr. 252).

**<u>Discussion:</u>**

In plaintiff's appeal brief, plaintiff argues that the ALJ erred by failing to give credibility to her subjective complaints, failing to apply the proper legal standards in assigning weight to the medical records and opinions, failing to properly develop the record, failing to consider evidence that fairly distracts from his findings, failing to proper determine her RFC, and relying on the testimony of a VE who responded to a hypothetical question that did not include all of plaintiff's functional limitations. However, after reviewing the entire record, we find that the ALJ decision is supported by substantial evidence.

At the onset, we note that plaintiff has submitted medical evidence that post-dates the relevant time period. We note, however, that the court need only consider the medical reports that reflect plaintiff's medical condition prior to the date her insured status expired. *See Davis v. Califano*, 605 F.2d 1067, 1072 n.6 (8th Cir. 1979) (stating that court would consider only the medical reports going to the claimant's medical condition prior to the date her insured status expired). As such, not all of the medical evidence contained in the record is relevant to the application for benefits currently before the court.

10

We first address the ALJ's assessment of plaintiff's subjective complaints.  The ALJ was required to consider all the evidence relating to plaintiff's subjective complaints including evidence presented by third parties that relates to:  (1) plaintiff's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and (5) functional restrictions.  *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).  While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole.  *Id*.  As the United States Court of Appeals for the Eighth Circuit  recently observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide."  *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).

After reviewing the record, we believe that the ALJ adequately evaluated the factors set forth in *Polaski*, and conclude there is substantial evidence supporting his determination that plaintiff's complaints were not fully credible.  The testimony presented at the hearing as well as the medical evidence contained in the record are inconsistent with plaintiff's allegations of disability.

The record currently before the court reveals that plaintiff did not seek extensive medical treatment for any of her alleged impairments during the relevant time period.  While plaintiff was treated for migraines, the records clearly show that plaintiff was not taking routine prescription medication to prevent or treat said headaches.  *See Haynes v. Shalala*, 26 F.3d 812, 814 (8th Cir. 1994) (lack of strong pain medication was inconsistent with disabling pain); *Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005) (failure to take pain medication is relevant to the credibility determination).  Further, when plaintiff did receive treatment, the evidence indicates that she was

11

given injections of pain and anti-nausea medications and then released home in stable condition.  As plaintiff's condition clearly responded to treatment, it does not support a finding of disabled.  *See Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995) (holding that a condition that can be controlled or remedied by treatment cannot serve as a basis for a finding of disability)

As for plaintiff's alleged back pain, records pertaining to the relevant time period reveal that plaintiff only complained of back pain on two occasions.  *See Edwards v. Barnhart*, 314 F.3d at 967 (holding that ALJ may discount disability claimant's subjective complaints of pain based on the claimant's failure to pursue regular medical treatment).  In February 2002, she was prescribed Vicodin for pain but there is no evidence of an ongoing prescription.  A consultative physical examination conducted in 2003, after plaintiff's date last insured, revealed normal flexion, extension, and rotation of the spine and a normal range of motion in all areas.  In addition, an x-ray of her lumbar spine revealed only mild changes of osteophytosis and mild decreased disc space.  (Tr. 153).  While the medical records dated well after plaintiff's date last insured do indicate that plaintiff's condition worsened, the evidence before the court does not establish a disability due to back pain during the relevant time period.  *See Davis*, 605 F.2d  at 1072 n.6.

Plaintiff has also alleged disability due to bilateral carpal tunnel syndrome.  As previously mentioned, she underwent surgery on both wrists in July 1989.  Since that time, she alleges recurrent problems with pain, numbness, and loss of grip strength.  However, the relevant medical evidence does not reveal that plaintiff has been treated for significant complaints concerning her wrists.  *See Novotny v. Chater*, 72 F.3d 669, 671 (8th Cir. 1995) (per curiam) (failure to seek treatment inconsistent with allegations of pain).  In fact, the only relevant evidence pertaining to plaintiff's

12

wrists is a medical record showing that plaintiff underwent surgery and another record detailing a burn to her left wrist. An x-ray of her right hand in 2003 only revealed some osteoporotic bones. No significant abnormalities were noted. Here again, medical evidence dated well after plaintiff's date last insured suggests that her condition has deteriorated. However, the evidence does not reveal a disabling condition during the relevant time period. *See id*.

As for her mental limitations, the record does make clear that plaintiff suffered from depression and anxiety. However, the first medical record pertaining to plaintiff's mental health is dated June 2, 2004, at which time she was diagnosed with depressive disorder not otherwise specified and psychotic disorder not otherwise specified. (Tr. 244). On August 23, 2004, Dr. Donald H. Pennington completed a mental impairment questionnaire. He diagnosed plaintiff with recurrent and severe major depressive disorder. (Tr. 212). Dr. Pennington concluded that plaintiff was seriously limited but not precluded from working in coordination with or proximity to others without being unduly distracted; completing a normal workday and workweek without interruptions from psychologically based symptoms, and dealing with normal work stresses. (Tr. 215, 216, 217). Plaintiff's mental abilities were limited but satisfactory in all other areas. He also noted moderate functional limitations with regard to activities of daily living and concentration, persistence or pace. In addition, Dr. Pennington found that plaintiff suffered from marked limitations in the area of maintaining social functioning. (Tr. 217). Although no areas of decompensation were noted, Dr. Pennington did opine that plaintiff's impairments would last at least twelve months. (Tr. 218, 219).

However, records also indicate that plaintiff returned to work after her alleged onset date. Earnings records show that plaintiff had earnings in 1997, 1998, 1999, 2000, and 2002. (Tr. 62).

13

An emergency room record dated October 15, 2002, indicates that she was working at that time. (Tr. 130). Although the majority of these earnings did not amount to substantial gainful activity, plaintiff's ability to return to work does evidence her ability to perform work-related activities. *See Dunahoo v. Apfel*, 241 F.3d 1033, 1039 (8th Cir. 2001); *Starr v. Sullivan*, 981 F.2d 1006, 1008 n.3 (8th Cir. 1992). Likewise, her reported ability to play bingo evidences her ability to be around others. (Tr. 77). As such, we can not say that plaintiff's alleged mental impairments are disabling.

Therefore, although it is clear that plaintiff suffers from some degree of pain, she has not established that she is unable to engage in any and all gainful activity. *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) (holding that mere fact that working may cause pain or discomfort does not mandate a finding of disability); *Woolf v. Shalala*, 3 F.3d at 1213 (holding that, although plaintiff did have degenerative disease of the lumbar spine, the evidence did not support a finding of disabled). Neither the medical evidence nor the reports concerning her daily activities supports plaintiff's contention of total disability. Accordingly, we conclude that substantial evidence supports the ALJ's conclusion that plaintiff's subjective complaints were not totally credible.

Although plaintiff argues that the ALJ did not set forth reasons in the decision for discounting her credibility or her husband's credibility, the ALJ did acknowledge his duty to consider all alleged symptoms in accordance with the factors set forth in 20 C.F.R. § 404.1520 and *Polaski*. (Tr. 17). He also found that plaintiff's subjective allegations and the testimony of her husband were not totally credible when considered in light of the entire record. (Tr. 19-20, 22). This is a sufficient credibility finding. Contrary to plaintiff's contention, however, the ALJ is not required to explicitly discuss each *Polaski* factor. *See Dunahoo v. Apfel,* 241 F.3d 1033, 1038 (8th Cir. 2001) (holding that if the

14

ALJ discredits plaintiff's credibility and gives a good reason for doing so, the court will defer to his judgement even if every factor is not discussed in depth).

Plaintiff also contends that the ALJ erred in finding that she maintained the RFC to perform a range of medium work.  It is well settled that the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence." *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000).  The United States Court of Appeals for the Eighth Circuit has also stated that a "claimant's residual functional capacity is a medical question," *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000), and thus, "some medical evidence," *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam ), must support the determination of the plaintiff's RFC, and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace." *Nevland v. Apfel*, 2 04 F.3d 853, 858 (8th Cir. 2000).  Therefore, in evaluating the plaintiff's RFC, *see* 20 C.F.R. § 404.15459(c), while not limited to considering medical evidence, an ALJ is required to consider at least some supporting evidence from a professional.  *Cf. Nevland v. Apfel*, 204 F.3d at 858; *Ford v. Secretary of Health and Human Servs.*, 662 F. Supp. 954, 955, 956 (W.D. Ark. 1987) (RFC was "medical question,"and medical evidence was required to establish how claimant's heart attacks affected his RFC).

In the present case, the ALJ considered the medical assessments of non-examining agency medical consultants, a general physical examination, plaintiff's subjective complaints, and her medical records.  On August 5, 2003, a state agency medical examiner prepared a physical RFC assessment regarding plaintiff.  (Tr. 155-164).  The examiner reviewed plaintiff's medical records between October 1997 and July 2002 and concluded that plaintiff could occasionally lift and/or carry

15

fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk about six hours in an eight-hour workday, sit with normal breaks for about six hours in an eight-hour day, and push and/or pull without frequent rapid repetitive flexion/extension of her wrists. (Tr. 156). The examiner also concluded that plaintiff was limited to only occasional stooping and crouching but had no further postural, visual, communicative, or environmental limitations. He did, however, state that she would have manipulative limitations regarding gross manipulation. (Tr. 157- 159).

In September 2003, DDS recommended that plaintiff be found disabled with an onset date of November 20, 1998. (Tr. 169). The record is not clear as to why this proposal was made. However, prior to awarding benefits, the recommendation was to Drs. Kenneth Glass and Nancy Armstrong for approval. (Tr. 169).

On September 25, 2003, Dr. Glass, an orthopaedist, performed a medical evaluation to determine plaintiff's actual onset date. (Tr. 165). After reviewing plaintiff's medical records, Dr. Glass concluded that the medical records did not support an onset date of November 20, 1998. Instead, he noted that the first medical record to suggest plaintiff was suffering from a disability was dated July 23, 2003. As such, he recommended an onset date of April 23, 2003, which was three months prior to plaintiff's physical exam. (Tr. 165).

On October 2, 2003, Dr. Nancy Armstrong, another non-examining state medical consultant, completed a physical RFC assessment of plaintiff. (Tr. 170- 178). After reviewing plaintiff's medical record for the relevant time period, she determined that plaintiff had no exertional limitations. (Tr. 171). However, Dr. Armstrong concluded that plaintiff could not climb ladders, ropes, or scaffolds. She found plaintiff to have no further postural, manipulative, visual limitations,

16

or communicative limitations, although she did opine that plaintiff should avoid exposure to hazardous machinery and heights.  (Tr. 172-174).

While we do note that plaintiff's treating physician , Dr. Jacobs, did render an opinion concerning plaintiff's RFC, the letter is dated  June 7, 2004.  (Tr. 198).  Further, in that letter, he stated that plaintiff's *present* complaints of cervical spine pain with radiation to the right arm and migraines made her a good candidate for disability.  There is no indication in the letter that Dr. Jacobs was rendering an opinion as to plaintiff's condition during the relevant time period.  As his opinion is dated two years after plaintiff's date last insured, we do not agree with plaintiff's contentions that the ALJ failed to properly consider Dr. Jacob's opinion. *Davis*, 605 F.2d  at 1072 n.6 (stating that court would consider only the medical reports going to the claimant's medical condition prior to the date her insured status expired).

Likewise, the various medical records dated after plaintiff's date last insured which indicate that plaintiff was disabled in 2003 do not weigh against the ALJ's determination.  The fact that Dr. Glass concluded that plaintiff was disabled as of April 23, 2003, does not support her current application for benefits.  Dr. Glass stated that the evidence does not support a finding of disability prior to this date.  This opinion, coupled with the opinions of the other non-examining consultants and plaintiff's own medical records, provides support for the ALJ's opinion.  Therefore, based on all of the evidence contained in the file, we find substantial evidence supporting the ALJ's RFC determination.

Plaintiff also criticizes the ALJ for relying on the mental limitations found by Dr. Pennington during his 2004 evaluation but refusing to use evidence concerning her physical condition dated

17

during this same time frame.  We note, however, that the mental health records utilized by the ALJ in his RFC analysis are the only mental health records contained in the file.  As such, it was proper for the ALJ to consider and use the records to support his RFC assessment.  On the other hand, the record does contain medical evidence of plaintiff's physical condition during the relevant time period.  Because that evidence does not show that plaintiff's condition was as severe as it appears to have been after her date last insured, the ALJ did not err in failing to give significant weight to that evidence.  *Id.*

We also find that substantial evidence supports the ALJ's finding that plaintiff can still perform work that exists in significant numbers in the national economy.  In a hypothetical question to the VE, the ALJ asked the VE to assume that the applicant could lift and/or carry up to fifty pounds occasionally and twenty-five pounds frequently; stand/and or walk for at least six hours out of an eight-hour day; and sit for at least six hours of an eight-hour day (Tr. 115). The ALJ also asked the VE to assume that the individual could occasionally stoop and crouch, but could not perform frequent, rapid, or repetitive wrist movements, or climb ladder, ropes, or scaffolds.  (Tr. 115). Mentally, the ALJ stated that the individual had a limited but satisfactory ability to remember work-like procedures; understand, remember, and carry-out simple and detailed instructions; maintain attention and concentration; maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; make simple work-related decisions; perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers without unduly distracting them or exhibiting

behavioral extremes; respond appropriately to routine changes in a routine work setting; set goals and make plans independently of others; deal with stresses of semi-skilled work; interact appropriately with the general public; and, maintain socially appropriate behavior.  (Tr. 115). Further, he stated that the individual was seriously limited but not precluded from working in coordination with or proximity to others without being unduly distracted by them; completing a normal workday and workweek without interruptions from psychologically based symptoms; and, dealing with normal work stress.  (Tr. 115).

Based on this hypothetical, the VE testified that there were jobs in the national economy that this person could still perform.  (Tr. 115).  According to the VE, these jobs would include that of a newspaper carrier, which is classified as light, unskilled work (108 jobs locally, 1,305 jobs in Arkansas, and 127,987 jobs nationally); a motel cleaner, which is classified as light, unskilled work (210 jobs locally, 2,652 jobs in Arkansas, and 259,497 jobs nationally); and, a dump truck driver, which is classified as medium, unskilled work (138 jobs locally, 1,887 jobs in Arkansas, and 147,224 jobs nationally) (Tr. 115).  *See Long v. Chater*, 108 F.3d 185, 188 (8th Cir. 1997); *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996).  Accordingly, we find substantial evidence to support the ALJ's determination that plaintiff could still perform work that exists in significant numbers in the national economy.

Finally, we reject plaintiff's contention that the ALJ failed to fully and fairly develop the record.  The ALJ is required to develop the record fully and fairly even when a claimant has an attorney. *See Freeman v. Apfel,* 208 F.3d 687, 692 (8th Cir.2000) (ALJ only must order consultative examination when it is necessary for an informed decision); *See Strongson v. Barnhart,* 361 F.3d

19

1066, 1071-72 (8th Cir. 2004) (ALJ must develop record fully and fairly to ensure it includes evidence from treating physician, or at least examining physician, addressing impairments at issue). First, plaintiff contends that the medical evidence was inadequate for the ALJ to render an opinion concerning plaintiff's disability.  The evidence, however, is neither insufficient nor inadequate.  In fact, there is no indication in the record to suggest that additional medical evidence exists to rebut the ALJ's RFC findings.

Second, plaintiff contends that the ALJ should have developed the record further with regard to her physical limitations.  Specifically, plaintiff alleges that the ALJ should have requested clarification from Dr. Jacobs as to whether his opinion that plaintiff was disabled referred to her condition at the time the letter was prepared or related back to plaintiff's condition during the relevant time period.  However, Dr. Jacobs' letters made clear that he was referring to plaintiff's condition on the date the letters were prepared.  He stated that plaintiff's current condition made her a good candidate for disability.  As such, we can not say that the ALJ erred by failing to request clarification from Dr. Jacobs.  We find the current record provided the ALJ with the necessary evidence to make an informed decision regarding plaintiff's RFC.

**Conclusion:**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the plaintiff benefits, and thus the decision should be affirmed.  The undersigned further finds that the plaintiff's Complaint should be dismissed with prejudice.

AO72A
(Rev. 8/82)

ENTERED this <u>16th</u> day of January 2007.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)